**EXHIBIT A**

## IN THE COURT OF COMMON PLEAS
## SUMMIT COUNTY, OHIO

| | |
|---|---|
| AKRON METROPOLITAN HOUSING AUTHORITY, | CASE NO.   CV-2026-01-0407 |
| Plaintiff, | JUDGE MARY MARGARET ROWLANDS |
| vs. | |
| CASCADE VILLAGE NORTH LIMITED PARTNERSHIP, *et al.*, | |
| Defendants. | **ORDER** |

This matter comes before the Court upon the Emergency Motion for Appointment of Receiver and supporting documents (collectively, the "Motion") filed by Plaintiff Akron Metropolitan Housing Authority ("AMHA") which seeks the immediate ex-parte appointment of a receiver over the property, which is owned by AMHA and leased to the Cascade Village Limited Partnerships (as defined in the Motion), that is the subject of this action, commonly known as Cascade Village, with a main office located at 212 East North Street, Akron, OH 44304, and all other parcels of land located with the Cascade Village housing development as identified in the Motion and more particularly described in the legal descriptions attached hereto as **Exhibit A** (the "Legal Description"), including all improvements and amenities located there (collectively, the "Property").

As set forth in the Motion, the immediate appointment of a receiver is appropriate in this case to protect the residents living at the Property and to address the issues more fully set forth in the memorandum in support submitted with the Motion and AMHA is entitled to the appointment of a receiver under R.C. 2735.01(A)(1) and (7).

Having examined the pleadings and the documents filed in this case, and based on the findings below, the Court finds the Motion to be well-taken and it is hereby GRANTED. Pursuant to R.C. 2735.01(A), the Court find it appropriate to appoint a receiver over the Property.

The Court makes the following findings:

- Jurisdiction and venue are appropriate in this Court because the Property is located in Summit County, Ohio.

- Plaintiff initiated this case to obtain a declaration as to the termination of its leases of the Property with Cascade Village Limited Partnerships and obtain the appointment of a receiver (the "Complaint").

- The Property is fully described in the Legal Descriptions and in the documents attached to the Complaint.

- Plaintiff is the owner of the Property, is the lessor of the Property, and the holder of a valid lien on the Property.

- All prerequisites to the appointment of a receiver over the Property as required by R.C. 2735.01(A) have been met. In addition, the Court specifically finds as follows: (i) appointment of a receiver over the Property is appropriate to protect Plaintiff's interest in the Property as the Property is at risk of material injury such that the appointment of a receiver is legally appropriate and justified remedy under R.C. 2735.01(A)(1); and (ii) appointment of a receiver is appropriate in the case for the usages of equity under R.C. 2735.01(A)(7).

- The Court further finds that the appointment of the Receiver as receiver is appropriate due to his experience and qualifications. As set forth in the Motion, the Receiver has extensive experience in working with multi-family real estate that has been found to be subject to deferred maintenance. For these reasons, the Court finds the Receiver is qualified and his appointment is appropriate.

The Court finds that the proposal by Plaintiff to offer certain funding to the receivership, if necessary, is appropriate under the circumstances. In particular, the Court finds that future advances by Plaintiff to the receivership estate to fund the expense of this case, in accordance with R.C.

2735.04(C), and subject to the limitations on such advances as set forth herein, should be entitled to treatment as an administrative expense of the receivership estate and the payment of such expenses shall be secured by the Properties.

NOW THEREFORE, IT IS HEREBY ORDERED ADJUDGED AND DECREED AS FOLLOWS:

The Motion is GRANTED. John T. Hillyer of Hillyer Group, LLC (the "Receiver") is hereby appointed as Receiver over the Property (as further described below) pursuant to this Order of the Court, to take possession of, exercise full control over, prevent waste, preserve, manage, protect, and evaluate the appropriate disposition of the Receivership Property (as defined below). Such appointment shall become effective upon the entry of this Order on the Court's Docket, the posting of the required surety bond in the amount of $100.00, the cost of which shall be an expense of the Receivership, and the filing of an oath (the "Effective Date").

## I.    THE PURPOSE AND PROPERTY OF THE RECEIVERSHIP

1.    The purpose of the receivership is as follows: (a) to have the Receiver evaluate the condition and status of the Property, document all matters pertaining to its condition for the various parties in interest, (b) to have the Receiver take control of the Property and endeavor to maintain the Property in safe condition and in compliance with all applicable regulations and laws throughout the course of the receivership and any sale or transition process; (c) to have the Receiver make an evaluation as to the appropriate disposition of the Property, whether by sale or otherwise.

2.    The "Receivership Property" means and includes:

     a.      the Real Property, and all improvements and amenities thereon;

     b.      the collateral described in the Mortgage and other Loan Documents (collectively, the "Collateral");

     c.      all Revenues (defined below) of the Receivership Property; and

     d.      all equipment, fixtures, machinery, and any other personal property of the Cascade Village Limited Partnership, the Community Builders, Inc. ("Community Builders"), or any other property manager used in connection with the operation of the Real Property, the Collateral and Revenues (as defined herein).

3.     "Revenues" collectively means all cash, cash on hand, checks, cash equivalents, credit card receipts, demand deposit account, bank accounts, cash management or other financial accounts, bank or other deposits and all other cash collateral (all whether now existing or later arising); current and past due earnings, revenues, rents, issues and profits, accounts or accounts receivable (all whether unpaid, accrued or to become due); all claims to earnings, rents, issues, profits, income, cash collateral and all other gross income derived with respect to the Receivership Property or its management, whether earned before or after the Effective Date.

4.     Revenues, and any other funds coming into the hands of the Receiver which are not or will not be used for operation, maintenance or protection of the Receivership Property, or expenditures authorized by the Court for the costs of administration of the Receivership (including the fees of the Receiver and counsel), shall be held pending further Order of the Court.

5.     Neither the Lessees, or any other party with an interest in the Property, shall have possession of, control over, or any right to, the Revenues of the Receivership Property.

6.     The Receiver shall take possession of and receive from any bank, savings and loan association, depository, financial institution, brokerage or other entity, wherever located (collectively, "Financial Institutions"), any money on deposit in any such Financial Institutions belonging to or arising from the operation of the Receivership Property, whether such funds are in accounts titled in the name of Cascade Village Limited Partnerships, Community Builders, or any other manager of the Property (collectively, the "Defendants"), but excluding any monies paid to or held by AMHA. Receiver is hereby specifically authorized to obtain, use, and maintain possession and control of any and all of the Defendants' pre-receivership bank deposits, operating accounts, brokerage accounts, investment accounts, safe deposit boxes, special accounts, statutory accounts, petty cash or other depository accounts, lock box accounts, or accounts of any nature whatsoever (collectively, the "Accounts") made by or for the benefit of the Defendants with any Financial Institution. The Receiver may use the Defendants' tax identification numbers and business forms in

accordance with his duties under this Order. The Financial Institutions at which the Accounts are maintained are authorized and directed to continue to service and administer, without interruption, the Accounts as accounts under the control and supervision of the Receiver, and in their usual and ordinary course; receive, process, and pay any and all checks, drafts, wires, or automated clearing house transfers drawn on the Accounts after the appointment of the Receiver which are authorized by the Receiver. Subsequent to the entry of this Order, the Financial Institutions at which the Accounts are maintained are prohibited from offsetting, freezing, processing garnishments or otherwise impeding the use or transfer of, or access to, any funds deposited into the Accounts before or after the appointment of the Receiver without first obtaining either the prior written consent of the Receiver or an Order of this Court allowing such action. Nothing contained in this Order shall prevent the Receiver from opening or closing any financial accounts, as he may deem necessary and appropriate.

7.    Upon presentation of a copy of this Order, Defendants and all of its agents and representatives, representatives, and employees are ordered and directed to cooperate with the Receiver in the transition of the custody, control, and management of the Receivership Property to the Receiver. On the Effective Date, Defendants shall turn over to the Receiver all of the following in their possession:

A.    all keys and alarm codes needed to access and secure the Receivership Property;

B.    all documents, books, records and computer files, computer equipment, software, management files, equipment, furniture, supplies and all login names and passwords needed to access such software and computer files, email accounts maintained for operation of the Receivership Property (and all off-site financial records), including but not limited to all records concerning the Revenues, and the operation and management of the Receivership Property;

C.    an inventory of all equipment, furniture, vehicles, and supplies for and used in connection with the Receivership Property;

D.    all bank account records including bank statements and account access login and passwords;

E.      all petty cash funds;

F.      all Lease Agreements and related lease files;

G.      a current aged accounts receivable report or delinquency report and related files;

H.      an aged report of all trade payables and other payables and related files;

I.      a list of operating expenses;

J.      a list of utilities and utilities accounts;

K.      the most recent year-end and current operating statements;

L.      all employee payroll records and employee files;

M.      all existing service contracts;

N.      all pending bids for contractor work;

O.      all insurance policies;

P.      all insurance certificates;

Q.      documents identifying and summarizing all pending litigation except the instant action;

R.      such other records pertaining to the management of the Receivership Property as may be reasonably requested by the Receiver.

8.      Defendants, and their respective agents, representatives, or employees, are prohibited from removing any personal property from the Receivership Property or diverting any income or Revenues.

9.      Defendants shall fully cooperate with the Receiver in adding the Receiver and AMHA as additional insureds, and AMHA as the mortgagee, on all insurance relating to the operation and management of the Receivership Property, including but not limited to fire, extended coverage, property damages, liability, fidelity, errors and omissions, and workers' compensation, and modifying the policies if deemed appropriate by the Receiver. Defendants, and its respective agents, representatives, and any employees are prohibited from cancelling, reducing, or modifying any and all insurance coverage in existence with respect to the Receivership Property.

## II.     AUTHORITY AND DUTIES OF RECEIVER

The Court hereby authorizes the Receiver, as of the Effective Date, to do any and all of the following:

1.      To immediately and hereinafter collect, take and have complete and exclusive possession, control, and custody of the Receivership Property, including but not limited to the Real Property, the Collateral, and the Revenues.

2.      To operate all business on the Real Property under the authority of any existing leases, contracts, permits, licenses, and franchise agreements currently held by Defendants, or that are applicable to any of the Receivership Property;

3.      To identify and engage a property manager for the Property within 48 hours after the Effective Date, on terms and conditions substantially similar to those set forth in the Management Agreements (as defined in Exhibits H, O, and W to the Complaint), with the consent of Plaintiff.

4.      To provide written notice of the Receiver's appointment to all tenants of the Property within 10 days following the Effective Date. The Receiver, through the Property Manager, is authorized to enter into new residential leases, modify, or terminate existing residential leases, or other occupancy agreements in the ordinary course of business of the Property and to pursue all other attendant rights and remedies typically available to the property manager.

5.      To change any and all locks to the Receivership Property and, if appropriate, limit access to some or all of the Receivership Property;

6.      To take custody, control, and possession of all rents, payments, revenues, funds, profits, bank accounts, depositories, real property, personal property, and other assets of, or in the possession or control of the Defendants that in any way relate to the Receivership Property;

7.      To manage, control, operate, maintain, repair, and protect the Receivership Property, including, without limitation, the performing of environmental remediation if so required by applicable law;

8.      To negotiate and enter into all contracts necessary to manage, control, operate, maintain, repair, and protect the Receivership Property;

9.      To prepare and maintain books, records, and financial reports of the Receivership Property;

10.      To allow AMHA and Receiver, their counsel and appraisers or other independent third-party consultants engaged by AMHA and/or Receiver, access to the Receivership Property at all reasonable times to inspect the Receivership Property and all books and records, and to cooperate with AMHA and Receiver, their counsel, appraisers and other independent third-party consultants to evaluate the Receivership Property;

11.      To retain, hire or discharge on-site employees, agents, managers, servants, attorneys and accountants (none of whom are or shall be deemed to be employees, agents, managers, servants, attorneys or accountants of AMHA or Receiver) in the Receiver's sole discretion as may be necessary or advisable in the management, control or protection of the Receivership Property, without any liability to AMHA or Receiver for any action taken pursuant to this paragraph;

12.      To establish pay rates for any on-site employees;

13.      To immediately retain, employ or dismiss others, including but not limited to attorneys, accountants, agents, real estate brokers, management companies and other professionals as the Receiver may, from time to time, deem appropriate, on such terms and conditions as the Receiver deems appropriate who, in the Receiver's judgment, are necessary to advise and assist the Receiver in connection with the Receiver's rights, duties, and obligations hereunder, and no further order of this Court is required approving the retention of any such professional;

14.      To incur and pay all expenses reasonably necessary to manage, control, operate, maintain, repair, and protect the Receivership Property, and in furtherance of any contracts necessary to manage, control, operate, maintain, repair, and protect the Receivership Property;

15.    To review existing insurance policies and to retain, modify, or purchase appropriate liability and property damage insurance for the Receivership Property and to pay any premiums for additional insurance coverage for the Receiver in connection with the Receivership Property;

16.    To maintain detailed accounting records, supplied to the Receiver and AMHA upon request, an itemized accounting of the Revenues and any other funds received by or on behalf of the Receiver and operating expenses and other disbursements (including the Receiver's fees) paid or disbursed by or on behalf of the Receiver, and to file such reports of receipts and disbursements periodically as required under this Order;

17.    To open and maintain a bank account to be used exclusively for deposits and disbursements of Revenues and any proceeds realized upon the sale of all or part of the Receivership Property (the "Sale Proceeds") and funds of the Receivership Estate herein, and to direct payors to deposit funds due and owing in such accounts as directed by the Receiver;

18.    To receive and endorse checks pertaining to the Receivership Property, including checks made payable to Defendants or any agent of Defendants;

19.    To enter into borrowing transactions with AMHA on such terms and in such amounts as are necessary in the Receiver's judgment to manage, control, operate, maintain, and protect the Receivership Property;

20.    To pay and disburse to the Receiver a fee for the Receiver's services and reimbursement for any reasonable and necessary disbursements the Receiver incurs on behalf of the receivership estate, in accordance with the procedures and limitations set forth herein;

21.    To use the Revenues and Sale Proceeds for the payment of the ordinary and necessary expenses for the management, control, operation, maintenance, repair, and protection of the Receivership Property, including but not limited to, utilities, taxes, insurance premiums, and contractual commitments;

22.     To pay all appropriate real estate taxes, personal property taxes, any other taxes, or assessments against the Receivership Property;

23.     The Receiver shall not be responsible for the preparation and filing of any tax returns for the Defendants (including but not limited to income, personal property, commercial activity, gross receipts, sales and use or other tax returns) other than to provide the Defendants with information in the Receiver's possession that may be necessary for the Defendants to prepare and file tax returns. Defendants shall provide to the Receiver any information in their possession needed to file any tax returns for the Receivership Property should Receiver so request.

24.     To operate the Receivership Property under any existing name or trade name (or new name, if the Receiver deems it appropriate to do so);

25.     To determine and report to the Court and AMHA whether any Revenue previously received by the Defendants has been used for purposes other than for the management, control, operation, maintenance, repair, and protection of the Receivership Property;

26.     To open and review mail directed to the Defendants, and their representatives pertaining to the Receivership Property, and to direct such mail to other addresses as the Receiver may determine necessary or appropriate;

27.     To negotiate and enter into new leases, occupancy agreements and/or contracts; terminate or modify existing leases, occupancy agreements and/or contracts; pay all utilities, expenses and other obligations secured by or which may give rise to liens, and all other outstanding obligations to supplies and services in the ordinary course of business, including obligations incurred prior to the commencement of the receivership so long as the Receiver has determined that it is prudent to do so in order to maintain business relationships that are beneficial to the conduct of the receivership; make repairs necessary to the maintenance of the Receivership Property in the ordinary course of business and in order to preserve the Receivership Property; and to take all steps

necessary to comply with all requirements, regulations and laws applicable to the Receivership Property, and to deal with all regulatory authorities in connection with the same;

28.     To continue, manage, lease, and operate the Receivership Property, and enter into a listing agreement to sell the Receivership Property, with the consent of AMHA;

29.     To institute, prosecute, and defend, compromise, adjust, intervene in, or become a party to such actions and proceedings in state or federal courts as may in its opinion be necessary and proper for it to properly carry out its duties to manage, control, operate, maintain, repair and protect the Receivership Property or the carrying out of the terms of this Order, and likewise to defend, compromise, or adjust or otherwise dispose of any and all actions or proceedings instituted against it as Receiver or against the Receivership Property, where and to the extent that the Receiver determines, in its judgment, that such action is advisable or proper for the protection of the Receivership Property; and to retain counsel in connection with any of the foregoing;

30.     To reject any leases, management agreements or unexpired contracts entered into by the Defendants that are burdensome to the Receivership Property;

31.     To defend actions against the Defendants related to the Receivership Property and incur expenses to defend such actions to the extent that the Receiver believes, in his sole discretion, that any such action will protect and/or preserve the Receivership Property, subject to AMHA's approval;

32.     To take any and all actions, not specifically enumerated herein, which are necessary to properly and adequately manage, control, operate, maintain, and protect the Receivership Property during the pendency of this action.

33.     Notwithstanding the foregoing, the Receiver and the receivership estate shall not be liable for the payment of taxes of any kind, or assessments or goods provided to the Defendants or for the Collateral, incurred prior to the date of this Order. Any individual or entity that has provided any of the foregoing is hereby enjoined and restrained from discontinuing service to the Receiver or

the Receivership Property based upon the non-payment of such taxes, assessments, goods, or services prior to the date of this Order which pre-date the Effective Date.

34.     Execute any and all documents and instruments necessary to convey the Receivership Property as Receiver for the Defendants, as the case may be, including but not limited to purchase agreements, deeds, bills of sale, and all closing documents required by a title company approved by AMHA, and the closing statement with respect to any and all such sale(s) (including but not limited to all closing costs, proration, sales commissions, and any other adjustments to the purchase price) shall be subject to AMHA's approval;

35.     In the event the Receiver receives an offer to purchase all or part of the Receivership Property from a qualified third party, or the Receiver determines to sell all or part of the Receivership Property by auction with the approval of AMHA, the Receiver shall file a notice and motion with the Court, requesting the Court's approval of the Receiver's right to accept the offer and proceed to conclude the sale, or of the Receiver's right to proceed with the sale by auction. The Receiver's motion must be served on all parties hereto, and must provide the Court and all parties with a written copy of the third-party offer, and the Receiver's intentions in connection therewith. Any objection by any party to the Receiver's motion shall be filed with the Court within ten (10) days from the date of service of the Receiver's motion. Upon Court approval of the auction, sale or sales contemplated by any such motions, the Receiver shall take all steps it believes are reasonably necessary to effectuate the sale of the Receivership Property, in whole or in part, and as approved by AMHA. All proceeds of any such sale or sales shall be disbursed pursuant to order of this Court.

36.     Any sale of any Receivership Property pursuant to this Order shall be final upon closing, and all bona fide purchasers for value, their successors, and assigns, may rely upon any sale order entered by the Court.

### III.    EXTENT OF RECEIVER'S AUTHORITY AND
### LIMITATIONS ON RECEIVER'S LIABILITY

1.      Although the Receiver shall have possession and control of the Receivership Property, the Receiver shall not, and shall not be construed to have, taken title to the Receivership Property. Title to the Receivership Property shall remain as it is presently, as the case may be, unless foreclosed upon, in which case title to the Receivership Property will remain as it is presently, as the case may be, until the appropriate documentation is delivered.

2.      Without limiting or expanding the foregoing, the Receiver is authorized to exercise all powers generally available and shall be subject to all the duties of a Receiver under the laws of the State of Ohio that may be incidental to the management of the Receivership Property, as described in this Order. The Receiver shall have any additional powers that are provided by law and that the Court may from time to time direct or confirm.

3.      During the pendency of this action, the Receiver shall have the right to apply to this Court for further instructions or directions.

4.      The authority granted to the Receiver is self-executing unless the action requires approval by the Court or AMHA. The Receiver is authorized to act on behalf of, and in the name of Defendants, or the Receiver's name, without personal recourse against the Receiver.

5.      All advances made by AMHA to the Receiver for the benefit of the Receivership Property, including but not limited to any advances for working capital or improvements, and any other costs and expenses incurred by the Receiver under this Order shall be deemed advances for the protection of the Receivership Property. Any advances for the protection of the Receivership Property shall be fully secured by for the benefit of AMHA as first priority lien and security interests against the Receivership Property and as an administrative expense of this estate pursuant to R.C. 2735.04(C). Any and all funds advanced by AMHA to the Receiver under this Order shall be deemed made pursuant to contract, and be fully secured for the benefit of AMHA as first priority

lien and security interests against the Receivership Property and as an administrative expense of this estate pursuant to R.C. 2735.04(C), For the purpose of clarity, all such funds advanced, including interest on advances, shall be deemed a prior lien before the repayment of any and all other claims against the Receivership Property (except for taxes and assessments having first priority as a matter of law) or proceeds of either of them.

      6.     The Receiver, his employees, agents, professionals he may retain to assist him with the performance of his duties, and others engaged in connection herewith shall not be liable for actions taken or decisions made in performing the duties of the Receiver under this Order, which are based upon the exercise of reasonably prudent business judgment. Finally, the Receiver shall have no liability with respect to any employment, environmental, or other liabilities arising out of or relating to the Receivership Property or any indebtedness arising prior to its appointment and qualification as the Receiver.

## IV.    RECEIVER'S COMPENSATION, REPORTS, ACCOUNTING

      1.     The Receiver and his employees and agents shall receive compensation for the services rendered in discharge of the duties hereunder at a rate of $445.00 per each hour expended by John T. Hillyer or other partners of Hillyer Group LLC , $390.00 per each hour expended by directors of Hilyer Group, LLC, and at rates between $250.00 and $325.00 per hour for administrative support staff of the Hillyer Group LLC. Receiver shall also be reimbursed for all other costs and expenses incurred within the scope of the Receiver's duties as specified in this Order, including any out-of-pocket expenses. The Receiver shall be authorized to hire Chris Niekamp and Buckingham Doolittle & Burroughs, LLC as his counsel in this case at rates ranging from $450.00-500.00 for Partners and lower rates for Associates and paralegals.   In the event that the Receiver and the Parties initiate a process to market and sell the Property then the Receiver will propose to convert its hourly fee to a commission fee structure to pay the Receiver and any hired

and authorized brokers a commission fee based up to a total commission not to exceed 8 percent of the gross sale proceeds to be shared by the Receiver and any commercial real estate brokers.

2.      To obtain approval for payment of fees and expenses, the Receiver and/or any attorneys or accountants retained by the Receiver pursuant to this Order, shall file an application for the payment of fees and expenses (partial or final), and serve copies on all parties to this proceeding. Any parties (including, without limitation, AMHA) who wish to object to the fees shall file an objection within ten (10) days after the service of the Application. If an objection is filed, the Court may schedule a hearing to consider the party's objection. If no party objects to the Application and the Court does not schedule a hearing, the Application shall be deemed approved and the Receiver may pay himself and his professionals fourteen (14) days after the service of the Application. All payments approved by the Court pursuant to this paragraph shall be paid directly from the Revenues and/or proceeds of any sale of the Property or, if such funds are insufficient to pay the Receiver's fees and expenses, shall be paid by AMHA as an advancement pursuant to Paragraph III.5 of this Order.

3.      The Revenue (including proceeds of any Receivership Advance) of the Properties, whether received by the Receiver or on deposit in any of Cascade Village Limited Partnerships' or Community Builders' accounts, may be applied to approved expenses pursuant to a written budget to be submitted by the Receiver and approved by Plaintiff (the "Budget"). The Budget shall include payment of all anticipated expenses and obligations coming due after the date of the Receiver's appointment as may be necessary or appropriate for such maintenance, protection, preservation or operation of the Properties, or necessary expenses in carrying out the directions of this Order (collectively, the "Receivership Expenses"). Receivership Expenses include, without limitation, all taxes and assessments, insurance premiums for Properties; utility expenses; operating expenses; lease obligations; and compensation for the Receiver and any professionals. Receiver shall provide an initial proposed budget to Plaintiff within 30 days after the Effective Date, and at least yearly

after that. Upon Plaintiff's approval of the Budget, the Receiver is authorized to make payments of Receivership Expenses, as set forth in the Budget. The Receiver is authorized to pay necessary and appropriate Receivership Expenses until the first Budget is prepared and approved by Plaintiff.

4.      With regard to any repair or other expenditure in excess of $10,000 each month that is deemed necessary but not included in an approved Budget, the Receiver shall first notify Plaintiff within five days prior to incurring the expenditure and seek Plaintiff's consent to such expenditure prior to incurring or paying such expenditure. If, however, the Receiver and Plaintiff cannot come to an agreement with respect to such expenditure, the Receiver shall file an application with the Court for authority to make such repair or incur such expenditure, together with acknowledgment of notice to Plaintiff of the time of hearing of said application. Plaintiff shall have the right to object to said application and be heard on such objection.

5.      The Receiver shall file reports detailing all receipts and disbursements made by the Receiver during applicable reporting periods and the Receiver shall make invoices, vouchers or cancelled checks related to any disbursements available to any party upon request.

6.      Nothing in this Order shall require the Receiver to advance funds other than from Revenues. The Receiver shall not be obligated to contribute personal funds in the performance of his duties hereunder.

7.      The Receiver shall furnish to the parties' counsel any additional information regarding the Receivership Property as required by law and as may be reasonably requested by them, but the Receiver is authorized to request instructions from this Court should any party request information or documents which are unduly burdensome or expensive to produce, or are requested to annoy or harass, or for any other improper purpose.

8.      The Receivership shall continue until further Order of this Court.

## V.     **GENERAL PROVISIONS**

37.     No person or entity shall file suit against the Receiver, or take other action against the Receiver, without an order of this Court permitting a suit or action; provided, however, that no prior Court order is required to file a motion in this action to enforce the provisions of this Order or any other order of this Court in this action.

38.     All persons, partnerships or corporations occupying the Real Property, or any portion thereof, shall pay all money now due or becoming due to the Receiver until further Order of this Court.

39.     The Receiver and his employees, agents and attorneys shall have no personal liability in connection with any liabilities, obligations, liens, or amounts owed to any of the creditors of Defendants: (a) for any pre-receivership debts; or (b) because of the Receiver's duties. Nothing in this Order shall grant any rights to trade creditors or general unsecured creditors, whose rights shall be determined solely in accordance with Ohio law.

40.     The Receiver and his employees, agents and attorneys shall have no personal liability, and they shall have no claim asserted against them relating to the Receiver's duties under this Order, except for claims due to their gross negligence, gross or willful misconduct, or malicious acts.

41.     Defendants, and all of its heirs, beneficiaries, shareholders, directors, officers, members, managers, agents, employees, representatives, accountants, attorneys, or any other person or persons or entities acting in concert or participating with Defendants, and all those who are under the direction and/or control of the Defendants, and all those having claims against the Receivership Property, are hereby enjoined from and shall not:

       a.     Commit or permit any waste on all or any part of the Receivership Property, or suffer, commit, or permit any act on all or any part of the Receivership

Property in violation of law, or remove, transfer, encumber or otherwise dispose of any of the Receivership Property;

b.    Demand, collect, receive, discount or in any other way divert or use any of the Revenues;

c.    Directly or indirectly interfere in any manner with the discharge of the Receiver's duties under this Order, or with the Receiver's possession, operation, or management of the Receivership Property;

d.    Expend, disburse, transfer, assign, sell, convey, devise, pledge, mortgage, create a security interest in, encumber, conceal or in any manner whatsoever deal in or dispose of the whole or any part of the Receivership Property, including but not limited to the Revenues, except as provided in this Order or by further order of this Court;

e.    Do any act which will, or which will tend to impair, defeat, divert, prevent, or prejudice the preservation of the Receivership Property, including the Revenues, or the preservation of AMHA's interest in the Receivership Property and Revenues.

f.    Refuse to cooperate with the Receiver and appear upon reasonable notice at such places and times as may be required to sign such legal documents as may be necessary and consistent with this Order.

42.    Any entity, person, or individual who willfully interferes with the authority of the Receiver as set forth in this Order or any subsequent Order of this Court shall be subject to all appropriate sanctions and penalties provided for under the laws of the State of Ohio and the United States, and any such conduct may be punishable as a contempt of Court.

43.    This Order shall not prejudice AMHA's rights to foreclosure on the Mortgage, or an action by AMHA under any security instrument or the Uniform Commercial Code with respect to the Receivership Property, or any of AMHA other claims as set forth in the Complaint or any amendments thereto.

44.    Except for any actions of AMHA provided for herein, any and all pending or anticipated litigation or post-judgment collection activities pertaining in any way to the Receivership Property are hereby stayed until further Order of this Court.

**IT IS SO ORDERED**.

_____
JUDGE MARY MARGARET ROWLANDS

## EXHIBIT A

## LEGAL DESCRIPTION

### CASCADE VILLAGE NORTH:

Parcel 1: Known as being all of Blocks A-R and B of the Cascade Village North Allotment as recorded in Reception Number 55187138 of Summit County Records.

Parcel 2: Known as being the West 42 feet of Lot B of Lods Addition, as shown by the recorded plat in Plat Book 2, Page 38 of Summit County Record of Plats.

Parcel 3: Known as being part of Tract No. 6 in said city and is known as Lot B Tract 6, Lods Addition, as surveyed by R.S. Paul and recorded in the records of Summit County, Ohio, Plat Book 2, Page 38 of Summit County Records of Plats.

Excepting the West 42 feet heretofore sold to Mathias Weiseman.

PPNs: 6762593, 6762594, 6762595, 6762596, 6762597, 6762598, 6762599, 6762600, 6762601, 6762602, 6762603.

### CASCADE VILLAGE SOUTH:

Situated in the City of Akron, County of Summit, State of Ohio, and known as being a part of Tract 7, formerly Portage Township and more fully described as follows:

Beginning for reference at the intersection of the centerline of East North Street with the centerline of Stuber Street:

Thence N 72°59'33" W, 32.50 feet along the centerline of said East North Street to a point;
Thence S 17°00'27" W, 30.00 feet to a point on the southerly right of way line of East North Street, said point being the True Place of Beginning for the parcel described herein;

Thence in a southeasterly direction 15.71 feet along the arc of a curve deflecting to the right, having a radius of 10.00 feet, a delta of 90°00'00", and a chord which bears S 27°59'33" E a distance of 14.14 feet to a point;

Thence S 17°00'27" W, 306.00 feet to a point;

Thence in a southwesterly direction 15.71 feet along the arc of a curve deflecting to the right, having a radius of 10.00 feet, a delta of 90°00'00", and a chord which bears S 62°00'27" W a distance of 14.14 feet to a point;

Thence N 72°59'33" W, 110.19 feet to a point;

Thence in a westerly direction 48.38 feet along the arc of a curve deflecting to the right, having a radius of 384.22 feet, a delta of 07°12'50", and a chord which bears N 69°23'08" W a distance of 48.34 feet to a point;

Thence N 65°46'44" W, 110.91 feet to a point;

Thence in a northwesterly direction 122.31 feet along the arc of a curve deflecting to the right, having a radius of 84.65 feet, a delta of 82°47'10", and a chord which bears N 24°23'09" W a distance of 111.94 feet to a point;

Thence N 17°00'27" E, 215.05 feet to a point;

Thence in a northeasterly direction 15.71 feet along the arc of a curve deflecting to the right, having a radius of 10.00 feet, a delta of 90°00'00", and a chord which bears N
62°0027" E a distance of 14.14 feet to a point;

Thence S 72°59'33" E, 332.50 feet to the Place of Beginning and containing 2.547 acres, more or less, as calculated by Thomas P. Tortorella, P.S. No.7194 for Floyd Browne Group in September, 2007.

PPN: 6762948, 6763193, 6763194, 6763195, 6763196.

## CASCADE VILLAGE EAST/WEST:

PARCEL 1- Cascade Village East

SITUATED IN THE CITY OF AKRON, COUNTY OF SUMMIT, AND STATE OF OHIO, BEING PART OF TRACT NOS, 6 & 7 IN ORIGINAL PORTAGE TOWNSHIP AND ALSO BEING A PART OF BLOCK 41, PERKINS ADDITION AS RECORDED IN PLAT BOOK 1, PAGE 13 OF SUMMIT COUNTY RECORDS OF PLATS AND ALL OF LOTS 1 THROUGH 28 INCLUSIVE AND 52 AND 53 OF SANFORD PARK ALLOTMENT AS RECORDED IN PLAT BOOK 14, PAGE 27 OF SUMMIT COUNTY RECORDS OF PLATS AND BEING MORE FULLY DESCRIBED AS FOLLOWS:

BEGINNING FOR REFERENCE AT A LEAD FILLED MONUMENT FOUND ON THE WESTERLY LINE OF STUBER STREET (50' R/W) AT THE NORTHERLY LINE OF NORTH STREET (60' R/W);

THENCE S 72°59'33" E ALONG THE NORTH UNE OF NORTH STREET, 50.00 FEET TO AN IRON PIN AT THE INTERSECTION OF THE EASTERLY UNE OF STUBER STREET WITH THE NORTHERLY LINE OF NORTH STREET AND THE TRUE PLACE OF BEGINNING FOR THE PARCEL INTENDED TO BE DESCRIBED HEREIN;
THENCE N 17°00'29" E ALONG THE EASTERLY LINE OF SAID STUBER STREET, 62.50 FEET TO A POINT; THENCE ALONG THE SOUTHERLY LINE OF CASCADE VILLAGE NORTH AS RECORDED WITH RECEPTION NO. 55187138 OF SUMMIT COUNTY RECORDS FOR THE FOLLOWING 21 COURSES:

1.    S 88°20'44" E, 231.75 FEET TO A POINT;
2.    S 78°1873" E, 103.44 FEET TO A POINT;

3.    S 69°45'00" E, 223.00 FEET TO A POINT;
4.    S 75°08'26" E, 232.17 FEET TO A POINT;
5.    N 76°3701" E, 79.35 FEET TO A POINT;
6.    5 25°09'40" E, 29.49 FEET TO A POINT;
7.    N 78°14'40" E, 30.84 FEET TO A POINT;
B. N 25°09'40" W, 32.29 FEET TO A POINT;
9.    N 73°28'31" E, 65.28 FEET TO A POINT;
0.    N 89°01'47" E, 160.85 FEET TO A POINT;
1.    N 71°34'40" E, 10.54 FEET TO A POINT;
2.    S 24°42'39" E, 18.80 FEET TO A POINT;
3.    N 57°34'26" E, 30.27 FEET TO A POINT;
4.    N 24°42'39" W, 14.74 FEET TO A POINT;
5.    N 57°40'06" E, 88.77 FEET TO A POINT
17.   N 56°10'59" E, 45.00 FEET TO A POINT;
18.   N 33°49'01" W, 55.07 FEET TO A POINT;
19.   N 57°40'06" E, 153,84 FEET TO A POINT;
20, N 50°4478" E, 203.21 FEET TO A POINT;
21. N 89°59'36" E, 118.41 FEET TO A POINT ON THE WEST LINE OF LANDS
DESCRIBED IN DEED TO OHIO EDISON COMPANY AS RECORDED IN
DEED VOLUME 1523 PAGE 219 OF SUMMIT COUNTY RECORDS;

THENCE S 00°0074" E, 173.23 FEET ALONG SAID WESTERLY LINE TO THE
NORTHEAST CORNER OF SAID OHIO EDISON LANDS;

THENCE S 89°59'36" W, 165.00 FEET ALONG THE NORTHERLY LINE OF
SAID OHIO EDISON TO THE NORTHWESTERLY CORNER THEREOF;

THENCE S 00°00'24" E, 356.05 FEET ALONG THE WESTERLY LINE OF SAID
OHIO EDISON PROPERTY TO THE SOUTHWESTERLY CORNER THEREOF;

THENCE N 89°59'36" E, 30.00 FEET ALONG THE SOUTHERLY LINE OF SAID
OHIO EDISON PROPERTY TO A POINT ON THE WESTERLY LINE OF PLUM
STREET (45' R/W);

THENCE S 00°00'24" E, 78.01 FEET ALONG THE WESTERLY LINE OF SAID
PLUM STREET TO THE NORTHEAST CORNER OF LOT 29 OF THE
SANFORD PARK ALLOTMENT AS RECORDED IN PLAT BOOK 14 PAGE 27
OF SUMMIT COUNTY RECORDS;
THENCE N 72°59'33" W, 39.02 FEET ALONG THE NORTHERLY LINE OF
LOT 29 OF THE SANFORD PARK ALLOTMENT AS AFORESAID TO THE
NORTHWEST CORNER THEREOF;

THENCE S 17°00'27" W, 100.00 FEET ALONG THE WEST LINE OF SAID LOT
29 TO THE SOUTHWEST CORNER THEREOF;

THENCE N 72°59'33" W, 1536.19 FEET ALONG THE NORTHERLY LINE OF
NORTH STREET TO THE TRUE PLACE OF BEGINNING AND CONTAINING
8.530 ACRES, MORE OR LESS, AS DETERMINED BY THOMAS P.
TORTORELLA, P.S. NO. 7194 FOR FLOYD BROWNE GROUP IN
NOVEMBER, 2007.

BEARINGS ARE BASED ON GRID NORTH, OHIO STATE PLANE COORDINATE SYSTEM NORTH ZONE (NAD 83).

PPN: 6763037

PARCEL 2 — Cascade Village West
SITUATED IN THE CITY OF AKRON, COUNTY OF SUMMIT, STATE OF OHIO AND PART OF FORMER PORTAGE TOWNSHIP TRACT 6 AND ALSO BEING PART OF SUBLOTS 24, 25, 134, 135 AND 136 IN THE GEORGE E. FLOWER ALLOTMENT AS RECORDED IN PLAT BOOK 6, PAGE 40 AND ALL OF THE LANDS DESCRIBED IN DEED TO THE AKRON METROPOLITAN HOUSING AUTHORITY AS RECORDED IN RECEPTION NUMBER 55449057 AND BEING MORE FULLY DESCRIBED AS FOLLOWS:

BEGINNING AT AN IRON PIN FOUND IN A MONUMENT BOX ON THE CENTERLINE OF N. HOWARD STREET AT THE CENTERLINE OF E. LODS STREET;

THENCE N 02°36'49" E ALONG THE CENTERLINE OF SAID N. HOWARD STREET AS ESTABLISHED AND MONUMENT ED BY THE CITY OF AKRON THROUGH PROJECT NUMBER 2004-008-00, 149.62 TO A POINT;

THENCE S 87°15'58" E, 35.44 FEET TO THE EAST LINE OF SAID N. HOWARD STREET ON THE SOUTH LINE OF SUBLOT NO, 25 IN THE GEORGE E. FLOWER ALLOTMENT AS AFORESAID AND THE TRUE PLACE OF BEGINNING FOR THE PARCEL INTENDED TO BE DESCRIBED HEREIN;

THENCE NORTHERLY ALONG THE SAID EAST LINE OF N. HOWARD STREET AS WIDENED BY THE CM' OF AKRON AND ACROSS SUBLOTS 25 AND 24 OF THE AFORESAID GEORGE E. FLOWER ALLOTMENT THE FOLLOWING 3 COURSES:

1. N 02°36'49" E, 133.63 FEET;
2, N 87°08'02" W, 5,44 FEET;
3. N 02°36'49" E, 82.00 FEET TO A 5/8" REBAR SET;

THENCE S 86°58'45" E ALONG THE SOUTHERLY LINE OF SUBLOT NOS. 7, 8 AND PART OF 9 IN THE R. A. GRIMWOOD ALLOTMENT AS RECORDED IN PLAT BOOK 4, PAGE 20 OF SUMMIT COUNTY RECORDS, 250.90 FEET TO A 5/8" REBAR SET;
THENCE S 07°36'15" W, ALONG THE WESTERLY LINE OF SAID SUBLOT NO. 9, 81.60 FEET W A 5/8" REBAR SET AT THE SOUTHWEST CORNER OF SAID SUBLOT NO. 9;

THENCE S 89°07'31" E, ALONG THE NORTH LINE OF SUBLOT NO. 134 IN THE GEORGE E. ROWER ALLOTMENT AS AFORESAID, 129.45 FEET TO A 5/8" REBAR SET AT THE NORTHWEST CORNER OF FLOWER COURT (40 FEET WIDE);

THENCE S 04°24'23" W ALONG THE WEST LINE OF FLOWER COURT AND THE EAST LINE OF SUBLOT NOS. 134, 135 AND 136, 133.79 FEET TO THE SOUTHEAST CORNER OF SAID SUBLOT NO. 136 AND A 5/8" REBAR SET;

THENCE N 81°34'43" W ALONG THE SOUTH UNE OF SAID SUBLOT NO. 136, 165.85 FEET TO A 5/8" REBAR SET AT THE SOUTHWEST CORNER THEREOF;

THENCE S 02°36'49" W ALONG THE EAST LINE OF SUBLOT NO, 25 IN SAID GEORGE E. FLOWER ALLOTMENT, 19.98 FEET TO A 5/8" REBAR SET AT THE SOUTHEAST CORNER THEREOF;

THENCE N 87°15158" W ALONG THE SOUTH LINE OF SAID SUBLOT NO. 25, 198.56 FEET TO THE TRUE PLACE OF BEGINNING AND CONTAINING 1.544 ACRES OF LAND AS SURVEYED BY THOMAS P. TORTORELLA, P.S. NO. 7194 FOR FLOYD BROWNE GROUP IN DECEMBER 2007.

BEARINGS ARE BASED ON GRID NORTH IN THE OHIO STATE PLANE COORDINATE SYSTEM (NAD 83) AS ESTABLISHED BETWEEN CENTERLINE MONUMENTS ON N. HOWARD STREET AT LODS AND CHARLES STREET BY THE CITY OF AKRON.

5/8" REBAR ARE 30" LONG AND CAPPED WITH AN ORANGE CAP STAMPED "FLOYD BROWNE GROUP, AKRON OHIO".

PPN: 6861005